IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DR. NINA TURNER,                               )
                                               )
                    Plaintiff,                 )
                                               )      Civil Action No.: 05-942
        v.                                     )
                                               )
MICHAEL O. LEAVITT, SECRETARY                  )
Department of Health and Human                 )
Services                                       )
                                               )
                    Defendant.                 )


MEMORANDUM OPINION

CONTI, District Judge.

I.      **Introduction**

        Pending before the court is the motion for summary judgment (Docket No. 48) filed by

defendant Michael Leavitt, Secretary of the United States Department of Health and Human

Services (hereinafter "defendant"), with respect to the claim asserted by plaintiff Dr. Nina Turner

(hereinafter "Turner" or "plaintiff") under Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §§ 2000e et seq. ("Title VII"). Plaintiff, in her complaint, asserted a claim against

defendant for employment discrimination based on sex. After considering the corrected joint

statement of material facts ("J.S."), defendant's motion for summary judgment, plaintiff's

response to that motion, and the parties' respective memoranda of law, the court will deny

defendant's motion for summary judgment.

## II.     Factual Background and Procedural History

The  National Institute for Occupational Safety and Health ("NIOSH") is a part of the Centers for Disease Control and Prevention ("CDC").  (J.S. ¶ 1.)  The CDC is part of the Department of Health and Human Services ("HHS").  (Id.)  Plaintiff is currently employed by the ("NIOSH") and her position is that of Research Physical Scientist, a grade level of GS-13.  (Id. ¶¶ 1, 2, 4, 8.)  Plaintiff has a Bachelor of Arts degree in Biology from the University of Virginia. (Id. ¶ 14.)  Plaintiff has a Masters of Science degree in Exercise Physiology from Penn State University.  (Id. ¶ 15.)  Plaintiff has a Ph.D. degree in Applied Physiology from Penn State University.  (Id. ¶ 16.)

Plaintiff's previous title was that of Research Physiologist.  She worked as a Research Physiologist at grade level GS-11, from 1989 to 1991.  (Id. ¶ 11.)  Her grade level as a Research Physiologist from 1995 to October 2002 was GS-13.  (Id. ¶ 8.)  Her current job duties are "to conduct research on personal protective equipment, the physiological and biological effects of personal protective equipment, such as safety harnesses, firefighter protective clothing, and to publish . . . research findings."  (Def.'s Ex. A at 9:9-15; J.S. ¶¶ 5, 6.)  Plaintiff also prepared job descriptions for two positions (physical science technician GS-13 and research biomedical engineer GS-13/14), evaluations and award nominations, all of which she submitted to Metzler who subsequently approved them.  (Pl.'s Ex. 17 at 22-25, 35-36; Pl's Ex. 19.)  Plaintiff's duties in her current position of Research Physical Scientist are the same as her previous duties as a Research Physiologist.  (J.S. ¶ 10.)

Plaintiff in November 2002 discussed her proposal for a women firefighter research project with Snyder.  (Pl.'s Ex. 20 at 250; Pl.'s Ex. 11, at 7.8; J.S. ¶ 104.)  Snyder responded to

plaintiff by saying that he once knew of a woman who tired to be a firefighter and it was a joke. (Id.) Snyder, initially in his August 2003 affidavit, denied having made such a statement and noted that he does not make "derogatory remarks about female performance based on their sex." (Pl.'s Ex. 5 at 1.) Snyder, however, later remembered that he had supervised a female employee who wanted to be a firefighter and stated that the woman experienced nasty jokes when she tried to join several organizations. (Pl.'s Ex. 21 at 14; J.S. ¶ 106.)

Plaintiff applied for the position of Physiologist, Technology Branch, National Personal Protective Technology Laboratory ("NPPTL") as both an internal and external candidate, as dictated by the vacancy announcement numbers MP7-03-003 and DE7-03-005. (Def.'s Ex. A at 50:18-22; Def.'s Ex. B; J.S. ¶ 17.) The duties for the GS-14 Physiologist position ("the position") are enumerated in the vacancy announcement and in the position description. (Def.'s Ex. A at 57:3-5; Def.'s Ex. B; Pl.'s Ex. 14; J.S. ¶ 18.) The position description states that:

> [t]he incumbent plans, prioritizes, initiates, designs, conducts, coordinates, and directs and leads basic and applied research products to advance the understanding [of] exercise physiology, heat stress, and the physiological responses associated with a wide variety of occupational personal protective technologies. The work is expected to result in new equipment, techniques, or methods to supplement or establish a theoretical basis for the design of personal protective technologies (PPT) for emergency responders and other American workers. . . .

(Def.'s Ex. H; Pl.'s Ex. 14; J.S. ¶ 50.) The position was described as 80% research and 20% professional advice and consultation. (Pl.'s Ex. 14; J.S. ¶ 109).

Applicants for the position were directed to address each of the "knowledge, skills and abilities" ("KSAs") for the position. (J.S. ¶ 20.) KSA number 5 is the "[a]bility to communicate written data in scientific form." (Id. ¶ 117.) After submitting their applications, applicants were

assigned a numeral rating by NIOSH Human Resources Specialist Idelle Bailin (hereinafter "Bailin") based upon the candidates' descriptions of their KSAs. (Id. ¶¶ 21, 24.) After assigning numerical ratings to the applicants, Bailin selected four candidates, including plaintiff, that she listed alphabetically on the promotion certificates and referred them to the selecting official, Jay Snyder ("Snyder"), for consideration. (Def.'s Ex. C at 2-3; Def.'s Ex. A at 51:7-9; Def.'s Ex. E; J.S. ¶¶ 27, 28, 33.) She received a rating of 19 out of 20 on the KSAs for the position, while each of the male candidates received a score of 12. (Pl.'s Ex. 12; J.S. ¶ 98.)

Snyder, a GS-13 Physical Scientist and the then Acting Chief of the Technology Branch at NPPTL, was the selecting official for the GS-14 physiology position. (J.S. ¶¶ 34, 35.) Rich Metzler, the Director of the NPPTL for NIOSH, also had a limited role in the selection process. (Id. ¶ 67, 68, 69.) Metzler testified that Snyder made the ultimate decision, but that Snyder consulted with him and informed him of Snyder's recommendations and rationale. (Def.'s Ex. F at 315:22-316:7; J.S. ¶ 69.) Snyder reviewed the certification list he received from Bailin, the human resources specialist, the written applications submitted by the candidates and made the determination that the four candidates deserved an interview. (Def's Ex. F at 395:10-20, 395: 24-396:19; Def.'s Ex. G at 5.) Snyder did not review the candidates' numerical ratings assigned by Bailin for the KSAs. (J.S. ¶¶ 30, 31.) Snyder testified that the successful candidate would be well-rounded with broad work experience in physiology, have insight and exhibit innovation, and that this candidate would utilize his or her background to provide insight into the direction that the human performance program at NPPTL would develop. (J.S. ¶¶ 51, 52, 53.)

Snyder interviewed plaintiff, Sean Gallagher ("Gallagher"), Greg Kennedy ("Kennedy") and Jon Williams ("Williams") and considered the interview to have played a very significant

part in his final selection.  (Def.'s  Ex. F at 395:16-20, 396:20-24; Def.'s Ex. G at 5; Def.'s Ex. A at 51:10-15; J.S. ¶¶ 39, 40.)  Snyder interviewed plaintiff and Gallagher in person.  (Pl.'s Ex. 5 at 2.)  He interviewed Kennedy and Williams by phone and, on a subsequent occasion,  interviewed Williams in person to further discuss Williams' background.  (Id.)  Snyder interviewed plaintiff on February 10, 2003 for a time period of forty-five minutes.  (Def.'s Ex. A at 58:22-23; J.S. ¶¶ 42, 43.)  He described the interview with plaintiff as being quiet and reserved, while the interview with Williams was active, lively, and involved give and take.  (J.S. ¶ 65.)

Plaintiff was found to be well-qualified for the job but was not selected as the final candidate.  (Id. ¶ 97.)  All the other candidates were male.  (Id.)  Williams was selected for the position.  (Id. ¶ 66.)

Snyder initially stated that he had discussed the Heroes (Homeland Emergency Response Operational Equipment Systems) project with both Williams and plaintiff and that Williams had more ideas about the project than plaintiff.  (Pl.'s Ex. 5 at 8.2-8.3; J.S. ¶ 101.)[1]  He described the Heroes project as the development of a fully integrated suit for first responders.  (Id.; Pl.'s Ex. 10 at 2.)  Snyder, although he took no notes during the interviews, believed that Williams had offered more insight into the ways and directs that the Heroes project could be developed.  (Id.) Plaintiff, in comparison, was felt to have been too focused on the narrow area of respirators and respiratory associated functions.  (Pl.'s Ex. 5 at 8.3.)  Plaintiff was not asked about the Heroes or local system project during the interview.  (Pl.'s Ex. 20 at 256; J.S. ¶ 102.)  Snyder later recalled that he did not discuss the Heroes project with either plaintiff or Williams.  (Pl.'s Ex. 10 at 1-2;

_____

[1]The following citation is derived from plaintiff's labeling of her exhibits.  For instance, a page in plaintiff's Exhibit 5 is numbered 8.1 or 8.2.

Pl.'s Ex. 23; J.S. ¶ 103.)   Snyder provided a different account stating that his recollection of having discussed the Heroes project with those candidates was made in error and that he did not have the Heroes project in mind when interviewing the candidates.  (Pl.'s Ex. 10 at 1-2.)

Snyder selected Jon Williams for the GS-14 position.  (J.S. ¶ 66.)  Selectee Williams had a Ph.D. degree and had served as the lead author on at least one publication.  (Id.  ¶¶ 85, 86.) Williams had managed a program as a section supervisor for a team of scientists.  (Def.'s Ex. G at 11-12; J.S. ¶ 64.)  Snyder noted that plaintiff had more publications than Williams, but believed Williams' explanation when he said that NASA discouraged publications of research in areas that he worked.  (Pl.'s Ex. 15; Pl.'s Ex. 16; J.S. ¶ 125.)   One of the other male candidates, Kennedy, was deemed to be the second choice even though he did not have any peer-reviewed publications.  (J.S. ¶ 131.)  Snyder did not consider publications as a significant qualification for the selected candidate.  (Id. ¶ 126.)

Snyder reviewed the KSAs he had received from Bailin and compared each candidate. He rated Williams as being superior in KSA number 1 which required "in-depth knowledge of the principles and methodologies related to advancing the understanding of exercise physiology responses associated with the use of personal protective technology."  (Pl.'s Ex. 5 at 8.3.)  Snyder also rated Williams as superior in KSA number 2 which gauged the ability of a candidate to develop new approaches, designs, methods, or techniques in physiology.  (Id.)  He felt that Williams' experience in management and supervisory duties gave him an advantage over plaintiff.  (Id.)  Snyder rated Williams and plaintiff as equal in the ability to relay scientific data. (Id.)  Snyder rated plaintiff to be superior to Williams in regard to KSA number 5 which dealt with research publications.  (Id.)  Snyder saw William's attitude and enthusiasm to do research as

enough of an asset to overcome the publication requisite. (Id.)

The reasons defendant proffered for not selecting plaintiff are: (1) she was not the best qualified candidate for the position because she did not demonstrate appropriate vision during the interview, (2) she failed to demonstrate breadth of experience in physiology, (3) Williams had described unique work with NASA Launch and Entry Spacesuit during his interview, and (4) plaintiff lacked the desired supervisory and program management experience. (Id. ¶ 99.)

On July 11, 2005, plaintiff filed a complaint with this court asserting a claim against defendant for employment discrimination based on sex in violation of Title VII and seeking damages, back page, promotion and other declaratory and injunctive relief. (Compl. at 1, 8.) On March 29, 2007, defendant filed a motion for summary judgment.

## III. Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. Id. at 249. The court may consider any material or evidence that would be admissible or usable at trial in deciding the

merits of a motion for summary judgment. Horta v. Sullivan, 4 F.3d 2, 8 (1st Cir.1993) (citing

10 Charles Alan Wright, Arthur Miller and Mary Kay Kane, Federal Practice and

Procedure § 2721, at 40 (2d ed. 1983)); Pollack v. City of Newark, 147 F.Supp. 35, 39 (D.N.J.

1956), aff'd, 248 F.2d 543 (3d Cir.1957), cert. denied, 355 U.S. 964 (1958) ("in considering a

motion for summary judgment, the court is entitled to consider exhibits and other papers that

have been identified by affidavit or *otherwise made admissible in evidence*") (emphasis added).

**IV.    Discussion**

    **A.    The Legal Framework**

Title VII was enacted to prohibit employers from discriminating against employees with

respect to the compensation, terms, conditions, or privileges of employment. Texas Dept. of

Cmty Affairs v. Burdine, 450 U.S. 248, 259 (1981). Since its inception, Title VII has made it an

"unlawful employment practice for any employer . . . to discriminate against any individual . . .

*because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)

(emphasis added). The Supreme Court recognized several years after the passage of Title VII

that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to

discriminate." McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). One manner in which

plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's

stated reason for the challenged action was not the true reason, but rather was a pretext for

unlawful discrimination. Burdine, 450 U.S. at 253. In McDonnell Douglas, the Supreme Court

developed the now familiar burden-shifting framework for courts to utilize as a tool in analyzing

disparate-treatment claims. The McDonnell Douglas framework requires a plaintiff alleging a

violation of Title VII to first establish a prima facie case of discrimination. The prima facie case,

the elements of which depend upon the type of claim the plaintiff is alleging, "eliminates the most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 254 & n.6. In so doing, the prima facie case "raises an inference of discrimination only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." Id. at 254.

If the plaintiff successfully demonstrates a prima facie case of discrimination, the burden of production (but not the burden of persuasion) shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment decision. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 n.5 (3d Cir. 1998). The burden on the defendant at this junction is "relatively light," and the defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision." Fuentes v. Perskie, 32 F.2d 759, 763 (3d Cir. 1994) (emphasis added).

Once the defendant offers a legitimate nondiscriminatory reason for the challenged conduct at issue, "the McDonnell Douglas framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [i]s discrimination *vel non*." See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000). The plaintiff, thus, has the ultimate burden of proving by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999) (citing Burdine, 450 U.S. at 252-53).

**B.      Prima facie case**

To establish a claim for sex discrimination under Title VII, plaintiff must establish that:
(1) she is a member of a protected class; (2) she is qualified for the position sought; (3) she was
rejected for the position; and (4) that the employer filled the position with a similarly situated
person from a different class. Barber v. CSX Distribution Serv., 68 F.3d 694, 698 (3d Cir.1995).
It is undisputed that plaintiff is a member of a protected class for her gender discrimination claim
as she is female.  She was qualified for the position as evidenced in the promotion certificate
containing an alphabetical listing of short-listed, well-qualified candidates, which included
plaintiff.  (Def.'s Ex. E at 2-3.)  She suffered an adverse employment action because she was not
the candidate ultimately chosen for the position.  Id.  The chosen candidate and all the other
candidates, except for plaintiff, were male.  Id.  Viewing the evidence in the light most favorable
to plaintiff as the nonmoving party and drawing all reasonable inferences in her favor, the court
concludes that sufficient evidence has been adduced to support an inference that an employment
decision may have based on illegal discriminatory criteria.  Plaintiff satisfactorily met her burden
of demonstrating a prima facie case of discrimination.

**C.      Nondiscriminatory Reasons**

Once plaintiff has established a prima facie case, the burden shifts to defendant to rebut
the presumption of discrimination by producing evidence that plaintiff was rejected, or someone
else was preferred, for reasons that are legitimate and nondiscriminatory.  Burdine, 450 U.S. at
254.  An employer satisfies its burden of production by introducing evidence which, taken as
true, would permit the conclusion that there was a reason that was not discriminatory for the
adverse employment decision.  Fuentes, 32 F.3d at 763 (3d Cir. 1994); see St. Mary's Honor Ctr.

v. Hicks, 509 U.S. 502, 509 (1993).  It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers.  Burdine, 450 U.S. at 254; see Bd. of Trs. of Keene State Coll. v. Sweeney, 439 U.S. 24, 25 (1978).

In this instant matter, Snyder reviewed the certification list he received from Bailin, the human resources specialist, the written applications submitted by the candidates and made the determination that the four candidates deserved an interview.  (Def's Ex. F at 395:10-20, 395: 24-396:19; Def.'s Ex. G at 5.)  Snyder stated that plaintiff was not chosen as the final candidate for the following reasons:  (1) she was not the best qualified candidate, (2) she did not articulate a vision for position that Snyder was looking for, (3) she did not demonstrate desired breadth of experience in physiology and (4) she lacked the required work and management experience needed for the position.  The court finds that these proffered reasons satisfy defendant's "relatively light burden" of production.  Fuentes, 32 F.3d at 763.

### D.    Pretext

The last part of the McDonnell Douglas burden-shifting framework requires that, "[o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion)."  Fuentes, 32 F.3d at 763.  Once an employer has stated a legitimate, nondiscriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must satisfy at least one of the two prongs articulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764.

### (1)   Prong One

A plaintiff must submit evidence that could cause a reasonable factfinder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring her case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, Sempier v. Johnson & Higgins, 45 F.3d 724, 764 (3d Cir. 1995), nor produce additional evidence beyond her prima facie case. Fuentes, 32 F.3d at 764. The plaintiff must, however, demonstrate such:

> "weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them 'unworthy of credence'" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [Fuentes, 32 F.3d] at 764-65 (quoting [Ezold v. Wolf, Block, Schorr, & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)]).

Simpson, 142 F.3d at 644.

The question asked in prong one of the Fuentes test is not whether the employer made the best, or even a sound, business decision; it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. Keller v. ORIX Credit Alliance, 130 F.3d 1101, 1109 (3d Cir. 1997).

12

An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a factfinder could not believe it worthy of credence. For example, in Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326 (3d Cir. 1995), the plaintiff was fired due to deficient sales performance. The evidence of record, however, disclosed that the plaintiff received a bonus three months prior to his termination and that he was the only sales employee in his region to have received such a bonus. The court held that, where the primary measure of the employee's performance was his sales, and where he was the leading salesperson in the region, the employer's stated reason for his termination was "contradictory to [its] admission that the most important standard of job performance is sales." Id. at 332. According to the court, "[a] factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program - sales." Id.

Sempier is another case in which an employer stated the plaintiff was terminated because of poor performance causing the company to restructure the nature of his responsibilities. The evidence of record, however, disclosed that (1) the plaintiff never received any unfavorable criticism that his performance was poor or inadequate; and (2) the employer failed to produce any other evidence of poor performance or to make specific allegations of the plaintiff's deficiencies. Sempier, 45 F.3d at 731-33. Thus, there was evidence on the record sufficient for a reasonable factfinder to conclude that the reason given in Sempier by the employer was a pretext for age discrimination. Id. at 732-33.

In this instant matter, plaintiff argues that defendant's nondiscriminatory, legitimate reasons were pretext for gender discrimination. She contends that she is able to show sufficient

"weakness, implausibilities and inconsistencies" in defendant's proffered reasons. Plaintiff

points to the shifting reasons for plaintiff's non-selection, and she asserts that she is more

objectively qualified than Williams.[2] Plaintiff argues that the statements made by agency

officials regarding research publications are not worthy of belief, and that defendant relied

heavily on the interview in its selection process.

Plaintiff initially argues that defendant's shifting reasons for non-selection of plaintiff are

enough to establish inconsistencies in the proffered reasons for not selecting plaintiff. She

asserts that in Snyder's first affidavit, dated August 25, 2003, Snyder stated that he discussed the

Heroes project with both plaintiff and Williams. He described the Heroes project as the

development of a fully integrated suit for first responders. Snyder, although taking no notes

during the interviews with plaintiff and Williams, felt that Williams had offered more insight into

the ways and directions that the Heroes project could be developed. Plaintiff, in comparison, was

felt to have been too focused on the narrow area of respirators and respiratory associated

functions.

---

[2]Plaintiff offers, as support for her argument that she had objectively superior qualifications, the opinions of two experts on human physiology, Dr. Phillip Bishop and Dr. Mike Greenisen. Both these experts reviewed the position description along with the application materials and determined that plaintiff was more qualified for the GS-14 physiology position than selectee Williams. (Pl.'s Ex. 13 at 117; Pl.'s Ex. 22 at 3.) The court finds plaintiff's reliance on the experts' opinions to be improper as she did not comply with Federal Rule of Civil Procedure 26(a)(2). The experts cannot be considered fact witnesses because they lack personal knowledge. Neither expert had ever been employed by NIOSH, although Dr. Bishop stated that he had visited NPPTL once. (Def.'s Ex. L at 120:19-121:5.). The experts did not participate in the selection process, but reviewed documentation relating to the selection of the final candidate.

Snyder reviewed the KSAs and judged each candidate. He felt that Williams was superior in KSA number 1 which required "in-depth knowledge of the principles and methodologies related to advancing the understanding of exercise physiology responses associated with the use of personal protective technology." (Pl's Ex. 10 at 8.3.) He also felt that Williams was the better candidate in regard to KSA number 2 which gauged the ability of a candidate to develop new approaches, designs, methods, or techniques in physiology. Snyder thought that Williams' supervisory experience gave him an advantage over plaintiff. He rated both candidates as being equal in the ability to communicate scientific data. He rated plaintiff to be the superior candidate in regards to KSA number 5 which dealt with research publications; he noted that plaintiff had more publications than Williams. Snyder stated that Williams had informed him that NASA discouraged the publication of research, but Snyder believed that Williams' attitude and wish to do research was enough of an asset to overcome the publication requirement.

Plaintiff asserts that she never discussed the Heroes project with Snyder during her February 10, 2003 interview. Snyder later provided a different account of the interviews with Williams and plaintiff, stating that "after consideration of the time-frame for [the Heroes project], . . . he did not mention [the project] during the interviews . . . and he did not have the [Heroes project] in mind when he made the selection." (Pl.'s Ex. 10 at 1-2.) Snyder stated that his prior statement in his August 2003 affidavit was an error as he had not had the opportunity properly to think about the time frame of the interview and the project. (Id.)

Defendant argues that the discussion of the Heroes project during the interviewing process is irrelevant as Snyder consistently maintained plaintiff was not selected as she was not

the best qualified candidate, she lacked the experience in physiology needed for the position, the vision that Snyder was looking for, and the work and management experience needed for the position.  Snyder, however, revised his account of his reasoning and the criteria he used to select the best candidate differs from the reasons provided earlier – namely that Williams' insight into and discussion of the Heroes project made him an attractive candidate and the better qualified candidate.  In other words, Snyder's first recollection was that Williams was able to articulate a vision that Snyder was looking for in the position, demonstrated the requisite work and management experience and sufficient breadth in physiology based upon his discussion of the Heroes project with Williams.  Snyder's revision of the reasons upon which he found Williams to be the better candidate raises inconsistencies and contradictions sufficient for a reasonable factfinder to conclude that Snyder's stated reasons are not worthy of credence.

Plaintiff refers to Snyder's stray remark concerning a woman who tried to be a firefighter as evidence of discrimination.  Plaintiff avers that she had first discussed her proposal for a woman firefighter research project with Snyder in the fall of 2002, around the same time as her application for the position. She was unsuccessful in getting a response from Snyder and when she asked him about the proposal for the research project, he had stated that he once knew a woman who tried to be a volunteer firefighter and he thought that to be a joke.  Plaintiff also mentioned the proposal during her interview with Snyder.  Snyder in his August 2003 affidavit denied ever making such a stray remark and stated that he does not make "derogatory remarks about female performance based on their sex."  (Pl.'s Ex. 5 at 1.)  Snyder later recanted stating that the allegations from plaintiff triggered his memory of a conversation with plaintiff in which he mentioned that he had previously supervised a woman who wanted to be a firefighter, but that

she was the victim of nasty jokes and his intent was to sympathize with the problems that female firefighters experience. Here, there are disputes about what Snyder said with regard to the woman who wanted to be a firefighter. The court, at the summary judgment stage, is required to resolve all disputed facts in favor of the nonmoving party, here plaintiff. The court must view that the stray comment was made as asserted by plaintiff.

Stray remarks are generally not sufficient standing alone to warrant a finding of pretext. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997). In previous decisions, the United States Court of Appeals for the Third Circuit established three factors to determine whether a stray remark is probative of discrimination: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the temporal proximity of the statement to the adverse employment decision; and (3) the purpose and content of the statement. Keller v. Orix Credit Alliance, Inc., 130 F.3d at 1112; Ryder v. Westinghouse Electric Corporation, 128 F.3d 128, 133 (3d Cir. 1997). These factors must be considered *in toto* in light of the nature and context in which the comment was made. Keller, 130 F.3d at 1112.

The Keller decision, which specifically addressed a comment made by a decisionmaker with respect to the second prong of the Fuentes test, is illustrative of this premise.[3] In Keller, the plaintiff alleging age discrimination offered evidence that his immediate superior, who ultimately made the decision to terminate Keller, remarked to him: "*If you are getting too old for the job,*

---

[3] Keller was an *in banc* decision of the United States Court of Appeals for the Third Circuit, giving the opinion even greater precedential value than a decision handed down by a three-judge panel. See Bolden v. Southeastern Pennsylvania Transp. Authority, 953 F.2d 807, 813 (3d Cir. 1991) (in banc panel not bound by prior precedents of three-judge panels, but rather only by principles of stare decisis); Mennen Co. v. Atlantic Mut. Ins. Co., 147 F.3d 287, 294 n.9 (3d Cir. 1998) (only an in banc decision can overturn a prior three-judge panel's opinion).

maybe you should hire one or two *young* bankers." Id. at 1111 (emphasis in original). The court

of appeals began its analysis of the comment by stating the following:

> [The supervisor's] alleged words certainly constitute evidence from which
> a reasonable factfinder could draw an *inference* of age-based animus, but *we do*
> *not think that these words alone could reasonably be viewed as sufficient to prove*
> *by a preponderance of the evidence* that age was a determinative cause of Keller's
> subsequent termination.

Id. at 1112 (emphasis added).  The court of appeals determined that the conversation took place

four or five months prior to the time the decisionmaker decided to terminate Keller, and the

comment did not refer to the specific employment question whether Keller should be terminated.

Id. at 1112.  Based upon this finding, the court of appeals determined that the comment, standing

alone, lacked the probative force to survive summary judgment.  See Keller v. Orix Credit

Alliance, Inc., 130 F.3d 1101 (3d Cir. 1997).

Like the situation in  Keller, there is evidence in the record that Snyder made the

comment about the female volunteer firefighter a few months before he interviewed plaintiff.

The record is clear that plaintiff testified that Snyder never made any comments to plaintiff about

her gender.  This court cannot conclude that this stray comment, alone, is evidence of sex

discrimination, but it can be considered in connection with the inconsistencies and contradictions

discussed earlier.

Plaintiff further asserts that defendant was too reliant on subjective criteria and on the

interview itself (as compared to the objective written applications that the candidates had

submitted) and that defendant undervalued her vision, research and supervisory/program

management experience.  Plaintiff argues that the term "vision" was not listed as part of the

position description and should not have been a primary factor in selecting the final candidate

and that it leaves room for the perpetration of bias. She refers to the job descriptions she had prepared for two positions (physical science technician GS-13 and a research biomedical engineer GS-13/14), evaluations and award nominations she had also prepared, all of which she submitted to Metzler who subsequently approved them.

Defendant's reasons for not selecting plaintiff were sufficiently inconsistent for this court to conclude that a reasonable jury could find that the stated reasons are an indication of discriminatory animus. Fuentes, 32 F.3d at 764-65. In one instance, Snyder, the selecting official, stated that the best qualified candidate was selected based on his discussion with that candidate concerning the Heroes project and it was through this discussion that he was able to gauge the candidate's vision (in terms of how the candidate would develop the program), the depth of experience the candidate had in physiology (in relation to the technology that would be utilized in the Heroes project), and the work and managerial experience. Snyder subsequently stated that his selection of Williams (and non-selection of plaintiff) had nothing to do with the Heroes project. Snyder had also made a derogatory stray remark regarding female firefighters while he was discussing plaintiff's research proposal with her. Although this stray remark alone would not suffice to lead to an inference of discrimination, it lends support to plaintiff's other evidence showing pretext. See Roebuck v. Drexel University, 852 F.2d 715, 733 (3d Cir. 1988).

It is not the function of this court to determine whether defendant's business judgment in hiring another candidate over plaintiff was correct. Rather, the court must view the evidence to determine whether defendant's stated subjective reasons for not hiring plaintiff could be reasonably found by the factfinder to be based on pretext. Viewing the record in the light most favorable to plaintiff, the nonmoving party, the court finds, although it is a close question, that

plaintiff proffered sufficient evidence such that would lead a reasonable factfinder to conclude that defendant's reasoning for not hiring plaintiff was based on discriminatory animus.

**(2) Prong Two**

As the court finds that plaintiff has satisfied her burden defendant's reason was pretextual under the first prong , the court need not examine the second prong of the <u>Fuentes</u> framework to determine if  plaintiff presented sufficient evidence of pretext.

**V.     Conclusion**

The court finds this instant matter to be a close issue.  After reviewing the joint statement of material facts, the defendant's motion for summary judgment, plaintiff's response the motion, and the parties' respective memoranda of law, the court finds that plaintiff has produced sufficient evidence for a reasonable factfinder to conclude that defendant's reasons for failing to select plaintiff for the GS-14 physiologist position were based on pretext and to render a verdict in her favor.  Accordingly, defendant's motion for summary judgment must be DENIED.

**Order**

**AND NOW**, this 25th day of March 2008, upon consideration of the parties' arguments and supporting documents,

**IT IS ORDERED** that defendant's motion for summary judgment (Docket No. 48) is **DENIED**.

By the court:
<u>/s/ Joy Flowers Conti</u>
Joy Flowers Conti
United States District Judge

cc:     Counsel of record